[No. 32062. Department Two. July 17, 1952.]

*In the Matter of the Estate of* LEONARD ROMANO, *Deceased.*
LUCIA ROMANO, *Individually and as Executrix, et al.,*
*Appellants,* v. MARY ALICE ROMANO *et al.,*
*Respondents.*[1]

[1]Reported in 246 P. (2d) 501.

*Kellogg, Reaugh, Hart & Towne,* for appellants.

*Royce & Royce* and *Allan Pomeroy,* for respondents Joseph Romano *et al.*

*Lenihan & Ivers,* for respondents Mary Alice Romano and Seattle-First National Bank.

HAMLEY, J.—In this action, the executrix and legatees under a will which was purportedly revoked by the subsequent marriage of the testator, now deceased, seek to reestablish the will by having the marriage declared void as of the date of the ceremony.

The executrix and legatees instituted the case by filing a petition contesting the rejection of the will. A demurrer was sustained and the cause was dismissed. Petitioners appeal.

The determinative facts, as alleged in the petition and admitted by the demurrer, may be briefly stated. The decedent, Leonard Romano, retired from the contracting business in 1946, at the age of sixty-four. In August of that year, when nearly blind and in poor physical condi-

tion, he came under the influence and domination of his newly-employed housekeeper. She was Mary Alice Sauve, then forty years of age. Within the next eleven months, Romano, who had always lived frugally, spent eighty thousand dollars, and also took his housekeeper on a trip to Canada.

On October 22, 1947, Romano executed the will in question. The will did not mention Mary Alice Sauve. It left one dollar each to three stepsons and one stepdaughter. All of the residue was left to the petitioners, his four nieces, one of whom was named executrix.

On April 19, 1948, Romano attempted to commit suicide. From this time on, his physical and mental condition rapidly deteriorated. On the morning of June 28, 1948, without notice to his secretary or any of his relatives, Romano and Mary Alice Sauve boarded a plane for Reno, Nevada. On arrival the same afternoon, a marriage ceremony was performed. At this time, Romano was mentally incompetent. He did not realize what he was doing and was incapable of entering into a contract or consenting to marriage. The trip to Reno and his participation in the marriage ceremony were procured by fraud and duress practiced by Mary Alice Sauve.

A few hours after the ceremony was performed, they returned to Seattle, arriving on the morning of June 29, 1948. Romano was never physically or mentally able to ratify or consummate the marriage, and did not thereafter voluntarily cohabit with Mary Alice Romano. He became seriously ill almost immediately upon returning to Seattle. He was taken to Maynard hospital on July 10, 1948. He became unmanageable because of his mental condition, and on July 21, 1948, was removed to a private institution for the insane. A guardianship proceeding was instituted, and on August 17, 1948, Romano was judicially declared incompetent. He died on May 30, 1950, without regaining his sanity.

Upon the petition of Mary Alice Romano, letters of administration were issued to Seattle First National Bank, on May 31, 1950. The estate subject to administration aggre-

gates $190,000. The will in question was thereafter offered for probate. It was rejected by the superior court on the ground that it had been revoked by the subsequent marriage of the testator.

The petition contesting the rejection of the will then pleads the Nevada marriage statutes, and asks for a decree nullifying the marriage and reinstating the will, because of the alleged insanity of Romano at the time the ceremony was performed, and because of the alleged fraud, duress, and undue influence exerted by Mary Alice Romano. There is also an allegation, on information and belief, that Mary Alice Sauve was, on the day of the marriage, under the age of forty-five years and afflicted with pulmonary tuberculosis in its advanced stages.

The questions presented by this appeal are whether the petition summarized above states a cause of action, and whether appellants have legal capacity to sue. The trial court answered these questions in the negative.

■■ Appellants and respondents are agreed that this marriage, if valid, operated to revoke the prior will. See RCW 11.12.050 (Rem. Rev. Stat., § 1399); *Koontz v. Koontz,* 83 Wash. 180, 145 Pac. 201. They are also agreed that the marriage was valid in Washington if the requirements of the marriage law of Nevada, where the ceremony was performed, were complied with. See *In re Gallagher's Estate,* 35 Wn. (2d) 512, 213 P. (2d) 621; Restatement, Conflict of Laws, 185, § 121. Respondents apparently concede that, under the allegations deemed admitted, this marriage did not comply with the marriage laws of Nevada, because Romano was incapable of consenting to the marriage and because fraud inhered in the transaction. Hillyer, Nevada Compiled Laws, §§ 4050, 4067.

Respondents, however, present several reasons why they believe appellants cannot prevail here, notwithstanding the fact that the marriage did not comply with the laws of Nevada. One of these reasons is that, in view of the nature of the defect in this marriage, it cannot be set aside in a collateral attack after the death of one of the parties.

Respondents contend that the right to attack a marriage collaterally after death of one of the spouses is to be determined according to the law of Washington. Appellants, on the other hand, argue that this question must be determined according to the law of Nevada. We find it unnecessary to decide this question, because, as we view it, the result is the same whichever law is applied.

Considering first the law of Washington, the applicable statute is RCW 26.04.130 (Rem. Rev. Stat., § 8449), reading as follows:

"When either party to a marriage is incapable of consenting thereto for want of legal age or a sufficient understanding, or when the consent of either party is obtained by force or fraud, such marriage is voidable, but only at the suit of the party laboring under the disability, or upon whom the force or fraud is imposed."

Construing this statute, this court has held that parents were thereby precluded from suing to set aside the marriage of their daughter, where the marriage license was obtained by fraud. *In re Hollopeter*, 52 Wash. 41, 47, 100 Pac. 159.

Appellants contend that this statute is designed only to deny relief to a party to the marriage who has taken advantage of the other party in one of the respects mentioned in the statute. Since appellants are not in that position, but claim under the injured party, it is contended that they have standing to attack the marriage notwithstanding this statute.

We do not believe that the application of the quoted statute can be so limited. Had the legislature undertaken only to specify certain classes of persons who were authorized to attack such a marriage, there might be some merit in appellants' contention. Even then, giving application to the rule of express mention and implied exclusion, there being no plainly indicated purpose to the contrary, it would seem that the legislature intended to withhold such right from persons not falling within the class mentioned in the statute.

But, in any event, the legislature has not limited itself to a designation of classes of persons authorized to sue. The quoted section of the statute expressly states that a marriage subject to such impediments is voidable, "but only" at the suit of the party laboring under the disability, or upon whom the force or fraud is imposed. Romano is that party and he is dead. Therefore, if the law of Washington is deemed to be controlling, appellants can not maintain this action.

If the law of Nevada is regarded as controlling with respect to appellants' right to attack this marriage, the following statutes must be considered:

"§ 4050. MARRIAGE A CIVIL CONTRACT. § 1. That marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential. . . As amended, Stats. 1943, 279." Nevada Comp. Laws, Supp. 1931-41 (1945 Pocket Part).

"§ 4066. WHEN VOID WITHOUT DECREE OF DIVORCE. § 18. All marriages which are prohibited by law on account of consanguinity between the parties, or on account of either of them having a former husband or wife then living, shall, if solemnized within this territory, be absolutely void without any decree of divorce or other legal proceedings." (Approved November 28, 1861, 94.) Hillyer, Nevada Comp. Laws (1929).

"§ 4067. MARRIAGE OF PARTIES INCAPABLE OF ASSENTING OR WHEN FRAUD PRACTICED—WHEN VOID. § 19. When either of the parties to a marriage for want of age or understanding shall be incapable of assenting thereto, or when the consent of the father, mother, or guardian as required by section 2 hereof has not been obtained, or when fraud shall have been proved, the marriage shall be void from the time its nullity shall be declared by a court of competent authority; . . . *provided further*, that no marriage may be annulled for fraud if the parties to the marriage voluntarily cohabit as husband and wife after having received knowledge of such fraud. As amended, Stats. 1947, 445." Nevada Comp. Laws, Supp. 1943-49.

"§ 4068. WHEN NOT TO BE JUDGED A NULLITY—INSANITY —COHABITATION AFTER DISABILITY REMOVED. § 20 . . . Nor shall the marriage of any insane person be adjudged

void, after his restoration to reason, if it shall appear that the parties freely cohabited together as husband and wife after such insane person was restored to a sound mind. . . As amended; Stats. 1947, 455." Nevada Comp. Laws, Supp. 1943-49.

"§ 4069. ACTIONS FOR ANNULMENT. § 21. When a marriage is supposed to be void, or the validity thereof disputed, for any of the causes mentioned in the two preceding sections, either party may file a complaint in the probate court of the county where the parties or one of them, resided, for annulling the same; and such complaint shall be filed, and proceedings shall be had thereon, as in the case of proceedings in said court for divorce, and upon due proof of the nullity of the marriage, it shall be adjudged null and void." (Approved November 28, 1861, 94.) Hillyer, Nevada Comp. Laws (1929).

It will be observed that the last-quoted section provides that "either party may file a complaint" to invalidate a marriage for any of the causes mentioned in the two preceding sections. The causes so mentioned include those on the basis of which appellants seek to set aside the marriage in question. Respondents argue from this, applying the rule of express mention and implied exclusion, that only parties to the marriage may institute such an action in Nevada.

It is to be noted that the Nevada statute does not expressly limit to the married parties the bringing of such suits. Nor has any decision of the supreme court of Nevada been called to our attention where such a construction has been placed upon the statute. Accordingly, we are not inclined to construe this statute, standing by itself, as precluding collateral attacks upon such marriages by third persons, after the death of one of the spouses.

We turn then to a consideration of the Nevada marriage statutes as a whole. Incestuous and bigamous marriages are declared "absolutely void without any decree of divorce or other legal proceedings" (§ 4066). There is no provision for the ratification or affirmance of such marriages under any circumstances. A marriage tainted with insanity or fraud, on the other hand, is not classified as "absolutely void." Instead, it is only void "from the time its nullity shall

be declared by a court of competent authority" (§ 4067). Moreover, such a marriage can, under certain circumstances, be ratified or affirmed at the option of the parties (§§ 4067, 4068).

It is our view that, by these contrasting provisions, the Nevada legislature has drawn a clear distinction between what it regards as void and voidable marriages. In so doing, it has classified, as voidable, marriages subject to the disability of insanity or fraud.

The term "void" with respect to marriages is simply a convenient label to designate any marriage which, because of the nature of the disability or impediment with which it is affected, is regarded, by common law or statute, as an absolute nullity, incapable of ratification. The term "voidable" is used to designate any marriage subject to a disability or impediment of such degree or nature that the marriage is considered valid unless set aside by court decree, and subject, in some cases, to ratification by the parties. *Toler v. Oakwood Smokeless Coal Corp.*, 173 Va. 425, 4 S. E. (2d) 364, 367, 127 A. L. R. 430; *Shamblin v. State Compensation Com'r.*, 122 W. Va. 652, 12 S. E. (2d) 527, 528; 1 Bishop on Marriage, Divorce and Separation, 112-114, §§ 265-270; 2 Schouler, Marriage, Divorce, Separation and Domestic Relations, 1353, § 1081; L. R. A. 1916C 690, annotation.

The significance of this classification between void and voidable marriages, for present purposes, lies in the fact that the common-law rule with respect to collateral attacks after death of one of the parties varies according to whether the marriage is void or voidable.

No decisions of the supreme court of Nevada relative to this common-law rule have been pleaded. The common law of Nevada with respect to this matter is, therefore, considered to be the same as that existing in this jurisdiction. *Allen v. Saccomanno, ante* p. 281, 242 P. (2d) 747.

In this state, the common-law rule in question was announced in *In re Hollingsworth's Estate*, 145 Wash. 509, 261 Pac. 403. It was there held that a voidable marriage is

valid for all purposes until annulled, and can be attacked only in a direct proceeding during the lifetime of both spouses. The marriage there in question was attacked on the ground that one of the parties was feeble-minded and the marriage was therefore "prohibited" by RCW 26.04.030 and 26.04.040 (Rem. Rev. Stat., §§ 8439 and 8440). While RCW 26.04.130 (Rem. Rev. Stat., § 8449), relating to remedies, previously referred to, was then a part of the statute law of this state, the statute was not referred to and the point was decided on the basis of common-law principles. The decision quotes with approval the following excerpt from the opinion in *Lau v. Lau*, 81 N. H. 44, 122 Atl. 345:

" 'As the marriage was not void, and the husband is dead, no inquiry can now be made into its validity.' "

It is to be noted that the allegations in the instant petition relative to tuberculosis come within the same statutes involved in the *Hollingsworth* case. That decision, therefore, holding that marriages prohibited by these statutes may not be collaterally attacked, is controlling as to the allegation of tuberculosis, as well as to the allegations of insanity and fraud.

Appellants call attention to the factual differences between the *Hollingsworth* case and the one now before us. In the earlier case, the action was brought by the mother and heir of the deceased husband. It was her claim that the marriage was invalid because the surviving wife was feeble-minded at the time of the marriage and had falsely sworn otherwise in her application for a marriage license. The parties had lived together thirteen years and had accumulated a substantial estate.

It is certainly true that the equities in favor of appellants here are far greater than those enjoyed by the plaintiff in the *Hollingsworth* case. The point is, however, that that decision was not made to turn upon the lack of equity in plaintiff's case, or its presence in the case of defendants. The *Hollingsworth* case was decided on the simple proposition that the marriage in question was voidable, and void-

able marriages may be attacked only in a direct proceeding during the lifetime of the parties.

In addition to questioning the applicability of the *Hollingsworth* decision, appellants seem also to question its soundness as an expression of the common law. They extensively review the court decisions of other states, and cite many in which, under somewhat similar circumstances, a collateral attack, after the death of one of the spouses, has been permitted.

In order to evaluate such decisions, it is necessary to bear in mind that it has been the common-law rule since earliest times, that insanity renders a marriage wholly void. *In re Gregorson's Estate*, 160 Cal. 21, 116 Pac. 60; 1 Bishop, *supra*, 120, § 285; 76 A. L. R. 769, 772. Likewise, it has always been recognized at the common law that the invalidity of void marriages could be maintained in any proceeding, either direct or collateral, before or after the death of the parties. 1 Bishop, *supra*, 107, § 258; 2 Schouler, *supra*, 1353, § 1081; 3 Nelson, Divorce and Annulment (2d ed.) 282, § 31.07; 76 A. L. R. 769, 771, annotation.

It follows that, where neither of these rules has been disturbed by statute, a collateral attack upon such a marriage after death of a spouse has usually been permitted. *Williams v. Williams*, 83 Colo. 180, 263 Pac. 725, 57 A. L. R. 127; *Orchardson v. Cofield*, 171 Ill. 14, 49 N. E. 197. For the same reason, where a marriage involving insanity is defined by statute as being void, such a collateral attack has been sanctioned. *Unity v. Belgrade*, 76 Me. 419; *Wiley v. Wiley*, 75 Ind. App. 456, 123 N. E. 252; *In re Canon's Estate*, 221 Wis. 322, 266 N. W. 918.

On the other hand, where the legislature has reclassified marriages involving this infirmity from void to voidable, the general common-law rule against collateral attacks has generally been applied. For example, see *Simpson v. Neely*, 221 S. W. (2d) (Tex.) 303; *In re Gregorson's Estate*, 160 Cal. 21, 116 Pac. 60, 62; *In re De Conza's Estate*, 13 N. J. Misc. 41, 177 Atl. 847, 849. As indicated above, such a legislative reclassification has taken place in Nevada.

The rule against collateral attack has no application, of course, where the claim is made that no ceremonial marriage was performed or that no common-law marriage was effectuated. *Damron v. Damron,* 301 Ky. 636, 192 S. W. (2d) 741. There are also cases where, under exceptional circumstances indicating fraud of the grossest kind, without apparent opportunity to detect or correct the inequity during the lifetime of the deceased spouse, a collateral attack after death has been permitted. See *Savage v. Olson,* 151 Fla. 241, 9 S. (2d) 363, and *Guthery v. Ball,* 206 Mo. App. 570, 228 S. W. 887. In the latter case, a suit to annul an ostensible marriage was permitted to be brought by the heir, where a marriage ceremony had been performed over the decedent while he was unconscious, and death had followed at once.

We need not decide whether, under similar circumstances, a collateral attack would be permitted in this state. Here the insane spouse lived almost two years after the marriage, and there is nothing in the petition before us to indicate that his mental condition was unknown to appellants prior to his death. There was ample time during Romano's lifetime for his general guardian or some next friend to make a direct attack, in Romano's behalf, upon the validity of this marriage.

We conclude that the decision in *In re Hollingsworth's Estate, supra,* prohibiting collateral attacks upon voidable marriages after the death of one of the spouses, is in accord with the general weight of authority and expresses the sound view. As before indicated, it must be assumed that this is also the rule in Nevada. Since, therefore, marriages affected with the disability of insanity or fraud are voidable in Nevada, it must be held that, under the laws of that state, appellants may not maintain this collateral attack.

We are therefore of the opinion that, under the laws of either Washington or Nevada, appellants are without standing or right to attack the validity of this marriage for the purpose of re-establishing the prior will. The trial court

did not err in sustaining the demurrer to the amended petition and dismissing the cause.

One other assignment of error remains to be considered. The person named as executrix under the rejected will is one of the plaintiffs and appellants. After the trial court filed a memorandum opinion indicating that the demurrer would be sustained, the named executrix filed a petition in her capacity as executrix for allowance of costs and attorneys' fees. A hearing was had and evidence was received as to a reasonable attorneys' fee in the trial court and on appeal. The trial court denied the petition. The appellant executrix assigns this as error, and asks us to award her such costs and fees.

The statutory provisions relative to contesting a will or the rejection of a will are to be found in RCW 11.24-.010 to 11.24.050 (Rem. Rev. Stat., §§ 1385-1389). It is there provided (RCW 11.24.050) that if the probate is revoked or the will annulled, assessment of costs shall be in the discretion of the court.

Applying this provision, it has been held to be proper to award costs to the executor of a will which has been admitted to probate, even though the will contest has been successful and the probate has been revoked. *In re Jolly's Estate*, 3 Wn. (2d) 615, 101 P. (2d) 995, 128 A. L. R. 993; *In re Klein's Estate*, 28 Wn. (2d) 456, 183 P. (2d) 518.

But the appellant executrix here is not defending a will which has already been admitted to probate. As the person named in the will as executrix, she presented the will for probate, as provided in RCW 11.20.010 (Rem. Rev. Stat., § 1379). The will was thereafter rejected upon an *ex parte* hearing, as provided in RCW 11.20.020 (Rem. Rev. Stat., § 1380). The only recourse, then, was to contest the rejection of the will, pursuant to the procedure set out in RCW 11.24.010 (Rem. Rev. Stat., § 1385). It is there provided that such a contest may be instituted by "any person interested in any will."

We have held that a person named as executor in a prior will is not a "person interested" within the meaning

of this statute, because the interest therein referred to must be a direct, pecuniary one. *In re O'Brien's Estate*, 13 Wn. (2d) 581, 126 P. (2d) 47. In that decision, this court pointed out the different position in which a person stands who has been named executor of a will which has not been admitted to probate, as compared to one who is the qualified and acting executor of a will then under probate. We said:

"In this state, then, when a will contest is instituted, the will under attack has been admitted to probate, and the executor thereunder is the legal representative of the decedent, clothed with full powers and entitled to take possession of, and to exercise jurisdiction and control over, all the property of the estate. And that situation continues until, by order of the court, the will has been revoked. On the other hand, an executor named in a prior will of the same decedent has no such rights or powers. He is not entitled to act in a representative capacity with reference to the decedent's estate, because the will, the source of his authority, has no vitality or effectiveness for any purpose prior to its admission to probate." (p. 590)

There is a statement in the later *Klein* case, *supra,* to the effect that, where a will is contested, it is the duty of the executor to take all legitimate steps to uphold the testamentary instrument *"whether before or after its probate."* (Italics ours.) The will contest in that case was instituted after the probate of the will, and that decision therefore cannot be considered as authority regarding an executor's duties prior to probate. As indicated in the *O'Brien* case, the statutory duties of the named executor of a will which has not been admitted to probate are terminated when the will has been presented for *ex parte* acceptance or rejection. It is then for the heirs, or anyone having a direct, pecuniary interest, to institute the contest.

It is, of course, of no significance that the appellant executrix here waged her contest against an administrator rather than against an established executor of another will of the same testator, as in the *O'Brien* case. She was without standing to engage in the contest as executrix, though she had the right to (and did) engage in such contest in her personal capacity as one of the heirs.

The trial court did not err in denying the petition of the appellant executrix for costs and attorneys fees.

The judgment is affirmed.

SCHWELLENBACH, C. J., HILL, FINLEY, and OLSON, JJ., concur.